UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HECTOR SOLORIO,

          Plaintiff,

-v-

ASPLUNDH TREE EXPERT CO., et al.,

          Defendants,

-v-

SAMAR TREE SERVICES, INC., et al.,

          Third Party Defendants.

Case No. 02-CV-8035 (KMK)

OPINION AND ORDER

Appearances:

George G. Coffinas, Esq.
Coffinas & Coffinas, LLP
New York, New York
*Counsel for Plaintiff*

Timothy J. McHugh, Esq.
Lavin, Coleman, O'Neil, Ricci & Finarelli
New York, New York
*Counsel for Defendants and Third Party Plaintiffs*

Patrick W. Brophy, Esq.
William D. Gallagher, Esq.
McMahon, Martine & Gallagher, LLP
New York, New York
*Counsel for Third Party Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Hector Solorio ("Solorio") suffered a debilitating head injury and severe brain trauma when he fell up to 40 feet from an aerial lift while doing tree service work for his employer, Samar Tree Service, Inc. ("Samar"). Solorio brought this action against the

manufacturer of the aerial lift and its parent and subsidiary companies, Asplundh Tree Expert Co., Asplundh Tree Expert Company, Asplundh Manufacturing Division, and Altec Industries, Inc.[1] (collectively "the Asplundh parties"), and the Asplundh parties impleaded Samar and Saul Rueda ("Rueda"), Samar's owner and sole shareholder. After the close of discovery, Samar moved for summary judgment, contending that New York Workers' Compensation Law § 11 ("Section 11") bars the Asplundh parties' third party claims against Samar.[2] For the reasons set forth on the record and herein, Samar's Motion for Summary Judgment is denied.

I. Background

A. Facts

Asplundh Tree Expert Co., by its former subdivision, Asplundh Manufacturing Division, designed, manufactured, assembled, marketed, and distributed Model LR-50 Aerial Lifts, including the aerial lift with serial number 78-4775 ("the aerial lift"), at issue here. (*See* Defs.' Answer ¶ 6; Defs.' Response to Third Party Defendant's Statement of Material Facts ¶ 7) On December 3, 1999, while employed as a tree service worker for Samar, Solorio was working in the aerial lift when it collapsed, causing Solorio to fall 30 to 40 feet to the ground. (Pl.'s Compl. ¶ 24; Defs.' Mem. of Law at 1)

---

[1] Asplundh Tree Expert Company is an international tree service company. It sold its manufacturing division (a named defendant here) to Altec Industries, Inc. in 1992. The named Asplundh divisions and Altec Industries, Inc. are jointly represented.

[2] Rueda also contended that it was not proper to pierce the corporate veil to hold him individually liable for Samar's alleged negligence. The Asplundh parties submitted no evidence or argument in opposition to Rueda's motion and conceded the motion at argument before the Court on December 16, 2004. In an order issued December 20, 2004, the Court granted summary judgment on behalf of Rueda, dismissed all claims against him, and reserved the summary judgment motion on behalf of Samar. (Order, Dec. 20, 2004)

Solorio experienced a protracted loss of consciousness and was taken to Westchester Medical Center, where he stayed until January 5, 2000.³ (Ex. J at 1) Injuries to Solorio's brain included bilateral intracranial hematomas, multiple skull fractures, a left parieto-temporal subdural hematoma, and a right temporal epidural hematoma. (Ex. J at 1) Solorio underwent several surgical procedures to evacuate the hematomas, (Ex. J at 1), repair facial and skull fractures, (Ex. L at 5), and later on his left eye to correct double vision that resulted from contusions in the left temporal and frontal regions of his head. (Ex. H at 2-3; Ex. L at 6) Both before and after Solorio was discharged from the hospital, he was treated with a variety of medications to manage seizures and depression. (Ex. J at 1) Solorio was discharged to Burke Rehabilitation Hospital where he underwent a program of physical, occupational, and speech therapy until his release on February 26, 2000.⁴ (Ex. J at 2) Upon his release, Solorio initially returned to living with his then-girlfriend and their young daughter. (Ex. S at 39, 49-50) He ultimately moved in with his brother and sister-in-law in Yonkers, New York and continued psychotherapy and courses of occupational, speech, and physical therapy. (Ex. Q at 64-65)

Solorio was born on July 10, 1970 in Mexico, where he grew up and attended school through approximately the ninth grade. (Ex. R at 12-14) He has worked in the United States as a ground man and tree climber since approximately 1988. (Ex. Q at 31-33)

---

³Third Party Defendants, Samar and Rueda, submitted Exhibits A-J accompanied by the Declaration of Patrick W. Brophy. Defendants/Third Party Plaintiffs, the Asplundh parties, submitted Exhibits K-V accompanied by the Declaration of Timothy McHugh.

⁴During this stay, Solorio displayed threatening and inappropriate behavior, making sexual remarks to the staff. (Ex. H at 7)

B.  Procedural History

Solorio commenced this personal injury action on September 10, 2002 in the Supreme Court of New York County.  On October 9, 2002, the Asplundh parties removed the action to federal court based on the parties' diversity of citizenship.  Solorio is a citizen of New York, the Asplundh divisions are Pennsylvania corporations, and Altec Industries, Inc. is an Alabama corporation.  (Defs.' Notice of Removal ¶ 3)  The Asplundh parties filed their Third Party Complaint on Samar and Rueda on or about March 8, 2004, seeking indemnification based on Samar's alleged failure to maintain its equipment, comply with applicable safety regulations, or properly train and supervise Solorio.  (Defs.' Third Party Compl. ¶ 20)

Samar denies these allegations and affirmatively defends that as Solorio's former employer, it is immune from liability under New York Workers' Compensation Law because Solorio did not suffer a "grave injury."  (Ex. E ¶¶ 6, 16-17)  This is the basis of Samar's current summary judgment motion.

C.  Medical Experts and Related Family Testimony

In support of its argument under Section 11 of the New York Workers' Compensation Law, Samar submitted the Affidavit of Registered Nurse John Matthew Pulhamus and the Letter Affirmations of Dr. William B. Head, Jr. and Dr. Richard Lechtenberg.  In opposition to this argument, the Asplundh parties submitted the expert reports of Dr. David M. Mahalick, Dr. Stewart A. Levine, and Dr. Adam N. Bender, certain medical records from Burke Rehabilitation Hospital and Westchester Medical Center concerning Solorio's treatment there, and medical reports from Dr. Stephen C. Klass, Dr. Charles Totero, and Dr. Spencer A. Colden.  The Asplundh parties also submitted transcripts of the depositions of Solorio, Solorio's brother, and

Solorio's sister-in-law.

### 1. Samar's Medical Evidence[5]

Dr. Head and Dr. Lechtenberg, both specialists in neurology and psychiatry, reviewed Solorio's medical records and examined Solorio on September 7, 2004 and August 23, 2004, respectively. Dr. Head's neurological examination of Solorio revealed

> evidence of a central left facial weakness and diplopia; and pupilar inequality, with partial dilation of the left pupil; and ptosis of the right eyelid. [Solorio] claimed [double vision] . . . . He also appeared to have difficulty doing tandem walking. He also demonstrated functional findings on sensory examinations of his face and body. There was no motor weakness present. His mental status findings appeared to be functional.

(Ex. H at 14)[6]

Dr. Head also reported that Solorio had a "normal gait and stance, with no evidence of kyphosis, scoliosis or abnormal lordosis."[7] (Ex. H at 11) When Dr. Head measured Solorio's right and left hand grip strength by a series of three tests with a dynamometer,[8] Dr. Head found Solorio's right hand capable of gripping 80 pounds and his left hand capable of gripping 60 pounds. (Ex. H at 12) Dr. Head considered these measurements normal for someone Solorio's

---

[5]For the reasons explained *supra* at Part II.B, the one-page Affidavit of Registered Nurse Pulhamus is not discussed here.

[6]Diplopia is a reference to double vision – the condition of perceiving two images of a single object – and ptosis is drooping of the upper eyelid. *See Dorland's Illustrated Medical Dictionary* 508, 1490-91 (29th ed. 2000).

[7]Kyphosis is a hunchback, *id.* at 951, scoliosis is an abnormal lateral deviation of the spine, *id.* at 1612, and lordosis is an abnormal anterior concavity in the curvature of the spine (i.e. "hollowback"), *id.* at 1027.

[8]A dynamometer is an instrument used to measure the force of muscular contraction. *Id.* at 552.

size and build. (Ex. H at 12)

Dr. Head believed that Solorio simulated pathology on mental status testing and sensory testing and considered Solorio's speech and language production normal and his thinking "logical and coherent." (Ex. H at 14-15)

Finally, Dr. Head concluded that Solorio's "residual problems cause him to be minimally, currently, partially neurologically disabled, but not totally labor disabled." (Ex. H at 17) In this regard, Dr. Head noted his review of therapeutic records from the Burke Rehabilitation Hospital which indicated that at several points in 2000, Solorio wanted to begin working again, and in 2001, wanted to get his driver's license and had used public transportation over the period of several sessions. (Ex. H at 17-18)

According to Dr. Lechtenberg, Solorio's cognitive signs indicated that he could follow three stage commands in Spanish, his mentation was grossly normal, and his affect was appropriate. (Ex. J at 2) Cranial nerve testing indicated that although Solorio "could not read using the left eye alone[,] [v]isual acuity was relatively good on the right [and] . . . [h]e had good lateral eye movements, but he had no coordinated up or down eye movements. Pupils were poorly reactive to light. The left lid was ptotic with an opening of 3 mm evident." (Ex. J at 2) Solorio's gait, strength, tone, and range of motion were all normal although his tandem gait was very poor. He will be "at risk for seizure activity for the rest of his life because of the extent of the head trauma sustained." (Ex. J at 3) Dr. Lechtenberg concluded that Solorio "is permanently disabled and will not be able to return to his previous employment. He is able to provide for his own care in terms of dressing, bathing, toileting, and other activities of daily living." (Ex. J at 3).

## 2. The Asplundh Parties' Medical Evidence

Dr. Mahalick, a neuropsychologist, tested and examined Solorio on September 3, 2004. Dr. Mahalick administered a series of tests designed to gauge Solorio's intelligence, memory functioning, sensory perception, attention and concentration, motor functions, and language functions. (Ex. L at 8-13) On the Wechsler Adult Intelligence Scale-III, Solorio had a Performance Scale I.Q. of 68, which falls in the second percentile. (Ex. L at 12) Solorio's processing speed and ability to rapidly track and sequence numbers were impaired. (Ex. L at 10-11) His performance was also impaired on several tests assessing tactile sensitivity and severely impaired on tests assessing bilateral fine motor speed. (Ex. L at 10-11) His grip strength was considered severely impaired bilaterally. (Ex. L at 11) Dr. Mahalick also noted that Solorio appeared to exaggerate or simulate his pathologies and that the "medical reports appear to substantiate the fact that Mr. Solorio has made a somewhat remarkable recovery." (Ex. L at 12-13)

Dr. Levine, an ophthalmologist, examined Solorio on September 13, 2004. Based on a variety of tests and exams, he concluded that "[a]ccording to Workers' Compensation guidelines, the combination of a visual acuity of 20/40, a small visual field defect, and diplopia in all fields of gaze except primary would equate to a scheduled 100% loss in the left eye." (Ex. T at 3)

Dr. Bender, a neurologist, examined Solorio on September 8, 2004. Dr. Bender concluded that Solorio has "mild cerebellar and/or vestibular dysfunction with poor tandem gait and balance control as well as loss of smooth pursuit." (Ex. U at 10) Dr. Bender noted that Solorio's performance on tests was inconsistent both within the course of Dr. Bender's examination and as compared to prior tests conducted by other specialists. (Ex. U at 9) He

7

concluded that Solorio's "main residual deficits are in cognition and memory" and that these injuries "can be considered permanent" in light of the five years that have passed since the accident. (Ex. U at 9)

Dr. Klass, a neurologist, evaluated Solorio regularly from March 22, 2000 until October 20, 2003. It appears that these evaluations may have been conducted, in part, for workers' compensation purposes.[9] Dr. Klass' notes repeatedly describe Solorio and/or his "work status" as "totally disabled." (Ex. N) In his July 7, 2003 evaluation, Dr. Klass describes Solorio as "[u]nable to work – totally disables [sic]," (Ex. N at 7, July 7, 2003), and in his final evaluation again writes Solorio "[r]emains totally disabled." (Ex. N at 2, Oct. 20, 2003) The evaluations consistently note Solorio's difficulty with double vision, left ptosis, and drooping of the left side of his face. (Ex. N)

It is also evident from Dr. Klass' evaluations that Solorio has had ongoing problems controlling his temper and behavior. At the time of his first office visit in March 2000, Solorio complained to Dr. Klass that he was "easily agitated" and "becomes nasty." (Ex. N at 20, Mar. 22, 2000) Such complaints continued throughout the evaluations and were echoed by family members who occasionally accompanied Solorio and reported to Dr. Klass that Solorio was "'explosive,'" (Ex. N at 15, Nov. 27, 2000), and became "'violent at times.'" (Ex. N at 14, Dec. 4, 2000) More than two years later, this behavior persisted and in July and October 2003, Solorio still complained of difficulty controlling his temper and becoming frustrated and easily agitated. (Ex. N at 4, July 10, 2003; Ex. N at 1, Oct. 20, 2003)

Dr. Colden is a physician who treated Solorio for physical rehabilitation and pain

---

[9]The evaluations consistently list "Compensation" as the "Referring Physician."

management beginning in November 2002 and ending in May 2003. (Ex. P) On December 11, 2002, Dr. Colden conducted a Functional Capacity Evaluation of Solorio that involved tests of Solorio's lifting, pushing, pulling, bending, squatting, crawling, walking, sitting, and hand functions. (Ex. P at 1, Dec. 11, 2002) Solorio's grip strength was 123 pounds in the right hand, 80 pounds in the left hand; he was able to manipulate small objects comfortably with both hands. (Ex. P at 2, Dec. 11, 2002) Dr. Colden characterized Solorio as "totally disabled" with "severe limitations in his physical functioning and work capacity." (Ex. P at 5, Dec. 11, 2002) He also speculated that Solorio "may be able to go back to some kind of work as of December 11, 2002 with [specified] guidelines, but given the severity of his physical, medical and cognitive impairments his choices for future employment are severely limited and [he] will probably need vocational retraining . . . ." (Ex. P at 5, Dec. 11, 2002)

Dr. Cuesta, a psychologist, treated Solorio at Burke Rehabilitation Hospital and his treatment notes span the period of June 2000 to October 2002. (Ex. M) On January 18, 2001, Dr. Cuesta noted that "employment is not recommended at this time due to [Solorio's] problems [with] impulse control, inattention, and difficulties [with] anger management. Perhaps a trial of supervised volunteer activity may be indicated at this time to test his ability to sustain the rigors of the work environment." (Ex. M at 21, Jan. 18, 2001) Approximately a year later, Dr. Cuesta described Solorio as "unemployable with no work skills other than the tree cutting that he did prior to the injury" and recommended "vocational counseling and support for a new occupation that is consistent with his aptitudes, abilities and interests." (Ex. M at 1-2, Feb. 1, 2002)

Dr. Totero, an orthopedic surgeon, conducted orthopedic examinations of Solorio on March 8, 2001 and August 8, 2000, at the request of the New York State Insurance Fund. Dr.

9

Totero concluded in the report of his March 8, 2001 examination that "on the basis of the claimant's head injury and neurologic conditions he is totally disabled at this time," (Ex. O at 3, Mar. 8, 2001), and in the report of his August 8, 2000 examination that "[a]ccording to the Workers' Compensation Board Medical Guidelines and after review of the medical records in this case, it is my impression that the claimant is totally disabled. . . . [T]he orthopedic examination of the claimant today clearly documents a total disability in this case." (Ex. O at 7, Aug. 8, 2000).

### 3. Deposition Testimony

At his deposition, Hector Solorio testified that he continued to experience a variety of physical and mental ailments as a result of the accident – including significant memory loss, double vision in his left eye, persistent pain in his back and left side, and the partial loss of ability to read in both Spanish and English. (Ex. R at 26-32) When he was released from Burke Rehabilitation Center, he lived for approximately a year with Elizabeth Marquez, (Ex. S at 48-49), the mother of his daughter, Leslie Solorio. (Ex. S at 9) Ms. Marquez testified that for a period of time after the accident, Solorio could not feed, dress, or bathe himself. (Ex. S at 42-44) After a month or a month and a half, Solorio regained the ability to feed himself. (Ex. S at 45-46) Within approximately three months after the accident, Solorio was able to toilet and bathe himself. (Ex. S at 42-44) When asked about her conversations with Solorio since the accident, Ms. Marquez testified that "Hector can talk to you about whatever is around him, but to have conversation about before [the accident], no." (Ex. S at 54)

Solorio moved in with his brother, Antonio Solorio, when Ms. Marquez decided she could no longer care for him. Antonio also testified that Solorio can presently toilet, bathe, and

feed himself. (Ex. Q at 66) According to Antonio, Hector Solorio does not have a driver's license, (Ex. Q at 61), cannot use a computer, (Ex. Q at 70), and generally covers one eye when he is trying to read. (Ex. Q at 68) Antonio described the change in his brother since the accident: "He used to play – he liked sports, he played soccer, he played with the children, he would take them everywhere. Now, basically, he can barely walk." (Ex. Q at 59) However, Antonio also testified that Solorio's daily routine is to take the bus in the morning to Port Chester or White Plains and to spend most of the day going to doctor's appointments. (Ex. Q at 67)[10]

## II. Discussion

### A. Applicable Standards

#### 1. Summary Judgment

Upon the motion of a defending party, pursuant to Federal Rule of Civil Procedure 56(b) and (c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on files, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the movant to show that there is no genuine factual dispute. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing

---

[10]The Court recognizes that there is evidence in the record that Solorio has exaggerated his memory loss and other symptoms resulting from his fall. (*See* Ex. L at 1, 9, 13) However, the Court is in no position to evaluate, and for purposes of this motion will not evaluate, the credibility of Plaintiff or any other witness. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("'Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.'" (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996))).

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). All reasonable inferences must be made in the non-movant's favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.,* 329 F.3d 282, 286-87 (2d Cir. 2003)); *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The genuine issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

Summary judgment is not favored in cases involving materially conflicting expert reports. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (concluding that the district court erred in granting summary judgment to insured in breach of contract claim for disability benefits because conflicting medical reports concerning plaintiff's latex allergy and ability to return to work created a genuine issue of material fact as to whether insured was "totally disabled" and entitled to benefits under the insurance policy); *Hudson Riverkeeper Fund v. Atlantic Richfield Co.*, 138 F. Supp. 2d 482, 490-91 (S.D.N.Y. 2001) (finding that "[i]n light of the disputes between the various experts, . . . genuine issues of material fact exist as to whether the [allegedly contaminated site] presents an imminent and

substantial endangerment to health or the environment . . . ."). This is no less true when the clash of experts involves the question of the effect of a physical impairment on a plaintiff's ability to function. *See Whitlow v. Visiting Nurse Ass'n of W. New York*, No. 03-CV-0005C, 2005 WL 2126463, at *11 (W.D.N.Y. Sept. 1, 2005) ("[T]he question whether a particular plaintiff is substantially limited in the major life activity of 'working' requires an 'individualized and fact-specific' inquiry, generally not well-suited for summary judgment." (quoting *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2d Cir. 1998))).

Conflicting expert evidence concerning the nature and extent of an alleged "grave injury" under Section 11 is especially likely to preclude summary judgment. *See Mustafa v. Halkin Tool, Ltd.*, No. 00 Civ. 4851, 2004 WL 2011384, at *10 (E.D.N.Y. Sept. 7, 2004) ("In this case, where there are conflicting expert opinions as to whether Mustafa suffered 'permanent and total loss of use' of his left hand, 'grave injury' becomes a question of fact for the jury to decide."); *Gavette v. Warner & Swasey Co.*, No. 90 Civ. 217, 1999 WL 118438, at *11 (N.D.N.Y. Mar. 5, 1999) (finding a genuine issue of fact for a jury's consideration where third party defendant submitted opinion of Workers' Compensation Administrative Law Judge stating that plaintiff suffered only a sixty percent loss of use of his left arm, as opposed to "total loss of use" as required by the statute, and third party plaintiff submitted medical evidence that plaintiff's doctors considered him "totally disabled").

### 2. Section 11

Section 11 provides that "[a]n employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer unless such third person proves through

13

competent medical evidence that such employee has sustained a 'grave injury' . . . ." N.Y. Workers' Comp. Law § 11 (2004). The Omnibus Workers' Compensation Reform Act of 1996 amended this section in order to strictly limit an employer's exposure to lawsuits for the on-the-job injuries of its employees. "It is . . . apparent that the means by which the reduction in lawsuits was to be accomplished was by barring suits except in extremely limited, defined circumstances. 'The grave injuries listed [in Section 11] are deliberately both narrowly and completely described. The list is exhaustive, not illustrative; it is not intended to be extended absent further legislative action.'" *Castro v. United Container Mach. Group, Inc.*, 761 N.E.2d 1014, 1016 (N.Y. 2001) (quoting Governor's Mem. approving L 1996, ch. 635, 1996 N.Y. Legis. Ann., at 460) (emphasis removed). Included in the statute's list of qualifying "grave injuries" is "an acquired injury to the brain caused by an external physical force resulting in permanent total disability."[11] N.Y. Workers' Comp. Law § 11 (2004).

Resolving a split among the Appellate Division departments, the New York Court of

---

[11]The full text of Section 11's indemnity provision is as follows:

> An employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer unless such third person proves through competent medical evidence that such employee has sustained a "grave injury" which shall mean only one or more of the following: death, permanent and total loss of use or amputation of an arm, leg, hand or foot, loss of multiple fingers, loss of multiple toes, paraplegia or quadriplegia, total and permanent blindness, total and permanent deafness, loss of nose, loss of ear, permanent and severe facial disfigurement, loss of an index finger or an acquired injury to the brain caused by an external physical force resulting in permanent total disability.

N.Y. Workers' Comp. Law § 11 (2004).

Appeals held that the term "permanent total disability" means "unemployability *in any capacity*." *See Rubeis v. Aqua Club, Inc.*, 821 N.E.2d 530, 535 (N.Y. 2004). Until *Rubeis*, the Appellate Division departments were split as to whether the term "permanent total disability" related to the plaintiff's employability or day-to-day functioning.[12] The court considered the day-to-day functioning test in light of Section 11's other enumerated "grave" injuries, the majority of which do not disable an employee from day-to-day functioning, and found that such a test would be "out of step with the balance of the section." *Id.* The court found that, comparatively, the unemployability test is in step with several other sections of the Workers' Compensation Law that associate "disability" with an inability to work. Additionally, "in keeping with legislative intent," unemployability "in any capacity" sets forth "a more objectively

---

[12]The First and Second Departments determined there was no "permanent total disability" where the employee remained capable of performing daily living tasks. *Rubeis v. Aqua Club, Inc.*, 761 N.Y.S.2d 659, 660-61 (App. Div. 2d Dep't 2003) (finding no "total disability" where plaintiff could still perform "simple tasks" and engage in day-to-day functions); *Schuler v. Kings Plaza Shopping Center & Marina, Inc.*, 743 N.Y.S.2d 141, 143-44 (App. Div. 2d Dep't 2002) (finding no "grave injury" because physician's report indicated plaintiff "managed a 'limited social agenda' and was able to, among other things, dress and feed himself and handle simple arithmetic"); *Barbieri v. Mount Sinai Hosp.*, 706 N.Y.S.2d 8, 12 (App. Div. 1st Dep't 2000) (finding no record of "total disability" and noting that a medical evaluation indicated the plaintiff was "'physically independent and ambulatory' and . . . seemed cognitively logical and goal oriented, albeit with some apparent slowness of speech and some distractibility"), *overruled by Olszewski v. Park Terrace Gardens, Inc.*, 798 N.Y.S.2d 1, 3 (App. Div. 1st Dep't 2005) (finding that "the *Barbieri* case relied on by the motion court in dismissing the owners' claims for common-law indemnification has since been overturned" (citing *Rubeis v. Aqua Club*, 821 N.E.2d 530 (N.Y. 2004))).

The Third and Fourth Departments interpreted "permanent total disability" to require only total disability from employment. *Way v. Grantling*, 736 N.Y.S.2d 424, 427 (App. Div. 3d Dep't 2001) (concluding that the legislature intended "permanent total disability" to relate to the injured party's employability because the majority of the other "grave injury" categories would not disable the employee from engaging in day-to-day functions and finding a sufficient material question of fact based on evidence of plaintiff's permanent disability "'from competitive employment' in even the most menial of tasks"); *Knauer v. Anderson*, 769 N.Y.S.2d 799, 801 (App. Div. 4th Dep't 2003) (agreeing with *Way*).

15

ascertainable test than equivalent, or competitive, employment." *Id.*

B. Application

It is Samar's burden to show that there is no evidence that creates a genuine factual dispute as to whether Solorio has suffered a "grave injury" within the meaning of Section 11. *See Harris*, 310 F.3d at 78 (noting that the moving party "bears the burden of establishing that no material fact exists as to whether she is totally disabled under the policy . . . ."). If met, this burden shifts to the Asplundh parties to present evidence showing that a reasonable fact finder could find such an injury.[13]

Drawing all inferences in favor of the Asplundh parties and bearing in mind the

---

[13] At the trial of a defendant's third party claim against a plaintiff's employer, Section 11 places the burden on the third party plaintiff to prove the plaintiff's "grave injury" in order to establish liability for indemnification. In *Ibarra v. Equipment Control*, 707 N.Y.S.2d 208, 211 (App. Div. 2d Dep't 2000), the New York Appellate Division suggested in *dictum* that on a third party defendant's summary judgment motion in a Section 11 case, the third party plaintiff bears the burden of showing the plaintiff's "grave injury," regardless of the movant's showing as to the absence of such injury.

However, this statement appears at odds with the accepted notion that a movant for summary judgment bears the burden of establishing judgment as a matter of law by virtue of the undisputed facts. *See Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000) (noting that summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party"). As applied here, Section 11's allocation of burdens of proof does nothing to relieve the moving third party defendant of its burden on summary judgment. *See Way v. Grantling*, 736 N.Y.S.2d 424, 428 (App. Div. 3d Dep't 2001) (rejecting *dictum* in *Ibarra* and finding that "[t]here is no basis in the Workers' Compensation Law, notwithstanding the third-party plaintiffs' burden at trial, for the abrogation of the [conventional] rules on a summary judgment motion involving a grave injury. In other words, the moving party bears the burden of establishing an absence of grave injury; it is not the burden of the party moved against to show the presence of a grave injury."). Indeed, the Second Department, in Section 11 decisions that post-date *Ibarra*, seems to underscore the isolated state of the *dictum* suggesting to the contrary. *See Marshall v. Arias*, 784 N.Y.S.2d 589, 590 (App. Div. 2d Dep't 2004) ("The appellants, as movants for summary judgment, bore the burden of establishing their entitlement to judgment as a matter of law . . . ." (citing *Fitzpatrick v. Chase Manhattan Bank*, 728 N.Y.S.2d 484 (App. Div. 2d Dep't 2001))); *Fitzpatrick v. Chase Manhattan Bank*, 728 N.Y.S.2d 484, 485 (App. Div. 2d Dep't 2001) (noting that the *Ibarra dictum* should not be followed).

16

reluctance to take expert disputes away from the jury, the Court reviews the parties' competent medical evidence to determine whether there is a genuine issue as to Solorio's ability to be employed in any capacity. There can be little dispute that Solorio has experienced a catastrophic head injury, undergone rigorous therapeutic treatment, and that he has made admirable strides to recovery. As a result, Dr. Head characterized Solorio as "partially neurologically disabled" but "not totally labor disabled." With the exception of some facial weakness, vision problems, and tandem gait difficulty, Dr. Head considered Solorio's testing performance to be within a functional or normal range. Samar's other expert, Dr. Lechtenberg, found Solorio's mental activity to be "grossly normal" and his physical strength and range of motion normal. Perhaps because of Solorio's poor performance on tests of his vision and pupilar equality and his continuing seizure risk, Dr. Lechtenberg considered Solorio "permanently disabled" and, in particular, unable to return to tree service work. Disability from "equivalent" employment, however, would not alone render Solorio "totally disabled" under *Rubeis*. *See Rubeis*, 821 N.E.2d at 535. Thus, with these reports, Samar has met its initial burden of demonstrating an absence of evidence that Solorio is unemployable in any capacity.

However, the Court also finds that the Asplundh parties have raised a genuine factual dispute on this issue. For example, according to Dr. Mahalick's testing, Solorio's mental processing, bilateral grip strength, and fine motor speed are impaired. The Asplundh parties contend that Solorio's 68 I.Q. means that he is mentally retarded. (Defs.' Mem. Law 10); *see also PDR Medical Dictionary* 1557 (2d ed. 2000) (suggesting same). And finding more than mere vision deficits, Dr. Levine examined Solorio in September 2004 and found the combined effect of Solorio's drooped left eyelid, persistent diplopia, and loss of visual acuity to be a total

17

loss of eyesight in Solorio's left eye. Based on these findings, a reasonable juror could conclude that Solorio is unemployable in any capacity.

Indeed, Dr. Klass, Dr. Colden, and Dr. Totero each characterized Solorio as "totally disabled."[14] Dr. Cuesta considered Solorio "unemployable with no work skills other than . . . tree cutting" and Dr. Colden described Solorio's employment choices as "severely limited." Samar points out that both of these doctors recommended vocational training. However, there is no indication that Solorio's condition will improve more than it already has. Given the substantial passage of time since the accident, Dr. Bender concluded in September 2004 that many of Solorio's current disabilities are permanent ones. These circumstances raise a material question of fact regarding Solorio's employability in any capacity.

The Court recognizes that the reports and evaluations submitted as "competent medical evidence" of Solorio's "grave injury," or lack thereof, range widely in their level of detail, their currency, and their underlying objectives. For example, the relevant portions of Dr. Colden's and Dr. Cuesta's evaluations date back to late 2002 and early 2001, respectively. And it appears that Dr. Klass and Dr. Totero may have evaluated Solorio's condition based, at least in part, on Workers' Compensation award standards that have dubious applicability here. *See Rubeis*, 821 N.E.2d at 535, n.* (citing *Castro*, 761 N.E.2d at 1016 n.2 (rejecting any analogy between the terms in Section 11 and Section 15, which governs compensation awards for disability, because

---

[14]Although the doctors do not state their reasons for using the term "total disability" and the significance of their conclusions may be undermined by their use of the term as it applies to workers' compensation awards, the Court must resolve this ambiguity in favor of the Asplundh parties. Where one or all of the doctors used the term "total disability" based on a clinical or medical judgment, then such a characterization would suggest disability from employment, creating a genuine issue as to Solorio's employability and precluding summary judgment.

18

of their "vastly different legislative purposes")). Moreover, there is agreement among the reports that subjective testing of Solorio is not always reliable due to his apparent exaggeration of symptoms and conditions.

The Court also recognizes that each side has submitted non-medical evidence in support of their claims. Samar cites the one page Affidavit of Registered Nurse Pulhamus, which is based on Pulhamus' brief observations of Solorio when Solorio visited the office of the New York State Insurance Fund to inquire about Social Security benefits. Pulhamus did not examine Solorio or spend any appreciable period of time in Solorio's company, but he observed that Solorio moved around the office without any apparent difficulty or signs of pain. (Ex. F at 2) This is not the competent medical evidence required by Section 11, but it still can be considered as the first-hand observations of a trained nurse. However, the Asplundh parties point to the deposition testimony of Solorio and his family members as evidence of Solorio's memory loss, language difficulties, chronic physical pain, and his general dysfunction, all of which are said to show that Solorio continues to suffer from a grave injury. While perhaps not dispositive in cases such as this, non-medical evidence can create a dispute on a material issue. *See Sergeant v. Murphy Family Trust*, 739 N.Y.S.2d 790, 791 (App. Div. 2002) (finding third party failed to submit evidence showing that facial scar resulted in grave injury, but finding that plaintiff raised issue of fact as to plaintiff's alleged "grave" brain injury "by submitting portions of plaintiff's deposition testimony in which plaintiff testified that he has experienced memory loss, anxiety, vision deficits, forgetfulness and personality changes").

Samar might well have the more compelling factual presentation. Its medical experts have most recently examined Solorio, and have prepared detailed reports of his progress since

19

drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255 (1986); *see also Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment."). In the end, the Court is to resolve all ambiguity and draw all reasonable inferences in favor of the non-moving party. *See Harris*, 310 F.3d at 78 (noting that "any ambiguity is to be resolved in favor" of a non-movant). When this is done, the Court cannot say that it is implausible that a jury could find Solorio to have suffered a grave injury when he fell 30 to 40 feet and severely injured his brain. *See Mustafa*, 2004 WL 2011384, at *10 ("Case law suggests that if there is a plausible case to be made for 'grave injury,' it becomes a question of fact for the jury to decide."). Accordingly, Samar's Motion for Summary Judgment is denied.

### III. Conclusion

For the reasons set forth above, the Motion for Summary Judgment on behalf of Samar is DENIED.

SO ORDERED.

Dated: November 30, 2005
New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE